IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL P. ARCHULETA,

        Plaintiff,

      vs.                                        Civ. No. 22-853 JFR

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 10)[2] filed January 19, 2023, in connection with Plaintiff's *Motion to Reverse and Remand for Rehearing With Supporting Memorandum,* filed April 21, 2023.  Doc. 17.  Defendant filed a Response on July 10, 2023.  Doc. 23.  Plaintiff filed a Reply on July 21, 2023.  Doc. 24.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is not well taken and is **DENIED**.

## I.  Background and Procedural Record

Plaintiff Michael P. Archuleta (Mr. Archuleta) alleges that he became disabled on August 1, 2014, at the age of forty-two years, because of lower back issues and bulging disc at

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 3, 5, 6.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 10), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

L4-5.  Tr. 545.  Mr. Archuleta completed four years of college in 2009.  Tr. 546.  Mr. Archuleta

worked as a behavioral therapist and school coach.  Tr. 533-40.  Mr. Archuleta stopped working

on August 1, 2014, due to his medical conditions.  Tr. 545.

On May 24, 2019, Mr. Archuleta filed an application for Social Security Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401

*et seq*.  Tr. 466-67.  On August 22, 2019, Mr. Archuleta's application was denied.  Tr. 169-81,

263-66.  On January 8, 2020, it was denied again at reconsideration.  Tr. 182, 183-201, 268-75.

Upon Mr. Archuleta's timely request, Administrative Law Judge (ALJ) Jeffrey N. Holappa held

a hearing on November 24, 2020.  Tr. 43-83.  Mr. Archuleta appeared telephonically with

nonattorney disability representative Aurelio Gallardo.[3]  *Id*.  On December 16, 2020, ALJ

Holappa issued an unfavorable decision.  Tr. 202-216.  On February 26, 2021, Mr. Archuleta

sought review of the ALJ's decision.  Tr. 618-21.  On April 23, 2021, the Appeals Council

entered a Notice of Order of Appeals Council Remanding Case to Administrative Law Judge and

explained that the hearing decision did not contain an evaluation of the medical source opinion

from Mr. Archuleta's treating provider Gary Coomber, M.D.  Tr. 225.  The Order directed that

on remand the ALJ will "give consideration to the medical source opinion from Dr. Coomber

pursuant to the provisions of 20 CFR 404.1520c[.]"  *Id.*

On October 6, 2021, ALJ Holappa held a second telephonic administrative hearing.  Tr.

84-120.  Mr. Archuleta appeared with nonattorney disability representative Aurelio Gallardo.  *Id.*

An impartial medical expert, Louis A. Fuchs, M.D., also appeared and testified.  *Id.*  On

October 19, 2021, ALJ Holappa issued a second unfavorable decision.  Tr. 230-49.  On

November 23, 2021, Mr. Archuleta sought review of the ALJ's decision.  Tr. 639-43.  On

---

[3] Mr. Archuleta is represented in these proceedings by Attorney Amber L. Dengler.  Doc. 1.

February 1, 2022, the Appeals Council entered a Notice of Order of Appeals Council Remanding Case to Administrative Law Judge and explained that the decision did not assess the medical necessity of Mr. Archuleta's cane contrary to the requirements of SSR 96-9p.  Tr. 259-62.  The Order directed the ALJ to assess the medical necessity of Mr. Archuleta's cane in accordance with SSR 96-9p and to give further consideration to Mr. Archuleta's maximum residual functional capacity.  *Id.*

On June 9, 2022, ALJ Michael Leppala held a third telephonic administrative hearing. Tr. 121-45.  Mr. Archuleta appeared with nonattorney disability representative Aurelio Gallardo. *Id.*  On July 6, 2022, ALJ Leppala entered an unfavorable decision.  Tr. 12-31.  On September 14, 2022, the Appeals Council denied Mr. Archuleta's request for review and upheld the ALJ's final decision.  Tr. 1-6.  On November 10, 2022, Mr. Archuleta timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.  Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987).

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**     **Standard of Review**

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

### III. <u>Analysis</u>

The ALJ determined that Mr. Archuleta met the insured status requirements of the Social Security Act through December 31, 2019, and that he had not engaged in substantial gainful activity since his alleged onset date through his date last insured.  Tr. 18.  He found that Mr. Archuleta had severe impairments of bilateral hip degenerative joint disease, degenerative disc disease of the cervical and lumbar spine, lumbosacral myalgia, and piriformis syndrome.  *Id.*  The ALJ determined that Mr. Archuleta's alleged depression did not cause more than a minimal limitation in the Mr. Archuleta's ability to perform basic mental work activities and was therefore nonsevere.  *Id.*  The ALJ determined that Mr. Archuleta's impairments did not meet or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.  Accordingly, the ALJ proceeded to step four and found that Mr. Archuleta had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations:

> Lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday, all with normal breaks; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; must avoid all exposure to unprotected heights, moving machinery, and hazardous machinery; and requires the use of a cane to ambulate.

Tr. 20.  The ALJ determined that considering Mr. Archuleta's age, education, work experience, and residual functional capacity, that Mr. Archuleta was capable of performing his past relevant work as a school social worker and a case worker through his date of last insured.  Tr. 30.  The ALJ determined, therefore, that Mr. Archuleta was not disabled.  Tr. 30-31.

In support of his Motion, Mr. Archuleta argues that the ALJ's RFC is not based on substantial evidence because (1) the ALJ failed to provide specific and legitimate reasons to

discount various medical opinions; (2) the ALJ failed to consider Mr. Archuleta's limitations

resulting from all impairments; and (3) the ALJ made an unsupported determination that

symptoms and limitations were not supported by the evidence.  Doc. 17 at 9-27.

The Court addresses each in turn.

A.    **The ALJ Applied the Correct Legal Standards in Evaluating the Medical Opinion Evidence and His Reasons for Finding the Opinion Evidence Not Persuasive Are Supported by Substantial Evidence**

Mr. Archuleta argues that the ALJ failed to apply the correct legal standards in evaluating

the medical opinion evidence of his two treating providers, *i.e.,* Physiatrist Robert Wallach,

D.O., and Family Practitioner Gary J. Coomber, M.D.

1.    **Relevant Medical Evidence**

a.    **Robert Wallach, D.O.**

(1)    **2013**

On December 4, 2013, Mr. Archuleta presented to physiatrist Robert Wallach, D.O., at

New Mexico Orthopaedics, for evaluation of low back pain for five months.  Tr. 980-82.

Mr. Archuleta reported he sustained injuries to his back from doing manual labor at his home

and a subsequent slip and fall at work in June 30 and November 7, 2013, respectively.[5]  *Id.*

Mr. Archuleta reported a 4/10 constant dull ache with occasional radiation into either buttock

that worsened with prolonged sitting, lifting or climbing, and improved with squatting, lying

down with knees bent, and walking.  *Id.*  Mr. Archuleta reported that he had not engaged in

physical therapy but was having monthly chiropractic manipulation.  *Id.*

---

[5] On September 16, 2013, Mr. Archuleta asked Chiropractor C. A. Riekeman to complete a "Physician's Statement" as part of a claim he made on his homeowners' insurance policy related to his injury on *July 30, 2013,* when he was "shoveling dirt as he did a lot of yard work.  Felt sharp pain as he shoveled."  Tr. 671.  On the "Accidental Injury Claim Form," Mr. Archuleta indicated his date of injury as *July 30, 2013,* and described that "[t]hrough manual labor – lifting, moving, bending up and down, walking on various (multi-level) graded levels of rock, weight varied from 5 lbs. to 80 lbs."  Tr. 672.

On physical exam, Dr. Wallach noted, *inter alia*, non-antalgic gait; normal coordination/balance; no assistive device; erect posture; full range of lumbar motion with no limitation of flexion, extension, side bending, or rotation; normal hip range of motion; and negative straight leg raises.  *Id.*  Dr. Wallach noted "[t]ender primarily low lumbar paraspinals as well as midline.  No pain sacroiliac region or on the sacrum itself."  *Id.*  Dr. Wallach reviewed MRI findings which demonstrated a disc bulge at L5-S1 and small bulge at L4-L5.  *Id.*  He noted some facet arthritis at L5-S1 as well.  *Id.*  Dr. Wallach's impression was persistent low back pain status post two injuries and disc herniation L5-S1.  *Id.*  He indicated Mr. Archuleta did not need surgery and that injections were usually not helpful for disc pain.  *Id.*  Dr. Wallach recommended physical therapy and to continue ice and heat as needed as well as anti-inflammatories.[6]  *Id.*

### (2)   2014[7]

On March 31, 2014, Mr. Archuleta returned to Dr. Wallach and reported that he continued to have 3/10 pain with activities and that physical therapy did not relieve his pain.  Tr. 998-99.  On physical exam Dr. Wallach noted "[m]inimal sacroiliac region discomfort.  He is most tender L5 paraspinals bilateral, and moderate tenderness L4 paraspinals."  *Id.*  Dr. Wallach

---

[6] On December 18, 2013, Mr. Archuleta presented for physical therapy with VibrantCare.  Tr. 686-89.  Mr. Archuleta attended twenty-four (24) physical therapy sessions from December 18, 2013, through March 18, 2014.  On March 18, 2014, at discharge, treatment notes indicated that Mr. Archuleta "tolerated today's treatment/therapeutic activity without complaints of pain or difficulty.  Pt. was scheduled for 2 more PT appts after re-evaluation which it was determined he would finish last 2 session & then be discharged.  He came for 1 but not the 2nd one stating he was sick.  He was called multiple times & msgs were left.  Pt never called back to reschedule last appt."  Tr. 777.

[7] Also in 2014, on August 4, 2014, Mr. Archuleta presented to Family Nurse Practitioner Kathy Fresquez-Chavez.  Tr. 790-93.  He reported chronic back pain for two years with constant 5/10 pain.  *Id.*  On physical exam, FNP Fresquez-Chavez noted, *inter alia,* the alignment of the major joints and spine is symmetrical; no deformities or misalignment of bones; no ecchymosis, erythema, lacerations, subcutaneous nodules, or signs of muscle atrophy; upon palpation no swelling, effusions, temperature changes, tenderness or crepitus; boney landmarks are normal and there is physiologic continuity of the anatomic structures; range of motion testing reveals no restriction or instability related to ligamentous laxity; muscle strength testing is 5/5 in most major muscle groups; hip flexion is noticeably weak bilaterally; pt. has mild discomfort to external rotation of the legs and tenderness to palpation of the lower back; muscles of the back and neck are contracted."  Tr. 791-92.  FNP Fresquez-Chavez instructed Mr. Archuleta to continue with physical therapy and ortho doctor and she referred Mr. Archuleta to the pain clinic.  *Id.*

indicated chronic low back pain lumbar spondylosis most significant at L5-S1 lumber stenosis L4-L5, and disc bulges L4-L5, L5-S1. *Id.* Dr. Wallach discussed the possibility of facet as opposed to disc pain and available treatment options. *Id.* Mr. Archuleta wanted to proceed with steroid injections.[8] *Id.*

On June 9, 2014, Mr. Archuleta reported to Dr. Wallach that his 3/10 pain was unchanged and that he continued to have pain with activities. Tr. 1004-05. Dr. Wallach discussed radiofrequency lesioning as a treatment option to which Mr. Archuleta agreed.[9] *Id.*

On July 8, 2014, Mr. Archuleta presented to Dr. Wallach and reported that he had improvement with radiofrequency lesioning for approximately seven days, but that his pain returned with sitting when he tried to go back to work. Tr. 1008-09. On physical exam, Dr. Wallach noted that Mr. Archuleta's gait was antalgic; lower body strength 5/5; full bilateral toe extension, dorsiflexion, knee extension; no pain with passive range of motion of the hips; and tender to palpation in the midline and paraspinals and sacrum between about L4 distal. *Id.* Dr. Wallach ordered an MRI to assess for any inflammatory/infectious changes post radiofrequency lesioning[10] and prescribed Tramadol for pain. *Id.*

On July 16, 2014, Mr. Archuleta reported continued pain with activities and that his symptoms improved with pain medication. Tr. 1012-13. On physical exam, Dr. Wallach indicated "[t]ender around the sacrum, sacroiliac territory bilateral. Minimal tenderness in the lumbar paraspinals and no significant midline lumbar tenderness." *Id.* Dr. Wallach indicated he did not know the etiology of Mr. Archuleta's pain. *Id.* Dr. Wallach noted that "[a]t the moment

---

[8] On May 20, 2014, and May 30, 2014, Dr. Wallach administered facet block injections. Tr. 1000, 1002.

[9] On June 24, 2014, Dr. Wallach performed radiofrequency lesioning. Tr. 1006-07.

[10] On July 14, 2014, Mr. Archuleta underwent a lumbar MRI demonstrating no significant change from previous MRI and was "unrevealing." Tr. 1010-11, 1012-13.

he cannot work due to the inability to sit and this pain also affects his concentration.  He might be able to go back in a few weeks depending on his response, possibly part-time initially." *Id.* Dr. Wallach wrote orders for more physical therapy.[11] *Id.*

On July 30, 2014, Mr. Archuleta reported to Dr. Wallach that his symptoms were unchanged and his current pain level was 6/10.  Tr. 1019-20.  Mr. Archuleta reported he could only sit for 15-20 minutes and that his walking tolerance was limited.  *Id.*  Dr. Wallach indicated that he did not understand the etiology of Mr. Archuleta's pain and was hopeful physical therapy would be helpful.  *Id.*  Dr. Wallach indicated he did not think Mr. Archuleta could go back to work based on Mr. Archuleta's reports of not being able to sit and concentrate for long periods of time.  *Id.*  Dr. Wallach added Lidocaine patches to Mr. Archuleta's pain medication therapy.  *Id.*

On August 21, 2014, Mr. Archuleta presented to Dr. Wallach and reported that his symptoms were slightly improved, although he continued to have pain with activities.  Tr. 1024-25.  Mr. Archuleta reported he had discontinued Tramadol and Lidocaine because he did not notice any benefit.  *Id.*  On physical exam, Dr. Wallach noted that Mr. Archuleta continued to be very tender to palpation at the low lumbar and lumbosacral region bilaterally.  *Id.*  Dr. Wallach

---

[11] On July 24, 2014, Mr. Archuleta presented to Paradigm Physical Therapy & Wellness.  Tr. 817-18.  Mr. Archuleta attended fifteen (15) physical therapy sessions.  On July 29, 2014, Mr. Archuleta reported he "felt better" after therapy. Tr. 819.  On August 5, 2014, Mr. Archuleta noted reduced right hip and thigh pain following therapy, gait notably improved, and improved lumbar extension.  Tr. 821.  On August 11, 2014, Mr. Archuleta demonstrated poor pelvic stability on "kneeling on Bosu."  Tr. 823.  On August 12, 2014, Mr. Archuleta reported soreness from his last session but "it's a good soreness."  Tr. 824.  Treatment notes indicated that Mr. Archuleta reported "[t]he way I've been pushed in here the last few visits has made me realize how weak I've become but have also been feeling better w/less painful days."  *Id.*  On August 19, 2014, Mr. Archuleta reported having walked a half mile and doing well.  Tr. 825. Mr. Archuleta reported that he did not have bad pain anymore and "that's such a wonderful improvement."  *Id.*  On September 2, 2014, Mr. Archuleta's reported back was "really hurting" and found relief with Tylenol.  Tr. 827.  On September 16, 2014, Mr. Archuleta presented with marked limp.  Tr. 831.  Therapist noted that "[e]vidently has derived little long term benefit from physical therapy which begs the question of continuance."  *Id.*  On September 25, 2014, Mr. Archuleta reported ongoing right side pain.  Tr. 834-35.  Treatment notes indicated that Mr. Archuleta was not limping, had good posture, no pelvic asymmetry or leg length discrepancy noted, full lumbar flexion, and 4/5 lower ab core strength.  *Id.*  Physical therapist John Tucker deferred treatment in lieu of relative lack of response to treatment.  *Id.*

noted that despite making slow improvements, Mr. Archuleta stated he did not believe he could tolerate going back to work.  *Id.*  Dr. Wallach encouraged Mr. Archuleta to speak with his employer about remote work options.  *Id.*  Dr. Wallach instructed Mr. Archuleta to continue with physical therapy and prescribed Zanaflex as a muscle relaxant.  *Id.*

On September 29, 2014, Mr. Archuleta reported no significant change in his symptoms, but had some improvement with walking.  Tr. 1031-32.  Mr. Archuleta reported that Zanaflex was helping him sleep and he was occasionally taking it during the day.  *Id.*  Dr. Wallach noted that Mr. Archuleta was overall somewhat improved, but still reported being unable to sit for meaningful periods of time.  *Id.*  Dr. Wallach discussed other treatment options including acupuncture, chiropractic adjustments, and sacroiliac joint injections.  *Id.*  Dr. Wallach provided a prescription for acupuncture and refilled Zanaflex.  *Id.*

On November 5, 2014, Mr. Archuleta reported no significant change in his symptoms and that he continued to have pain around the sacroiliac region and across the sacrum worse with standing and walking, and better in the squatting position.  Tr. 1033-34.  Mr. Archuleta informed Dr. Wallach that the IME report related to his workplace injury on November 7, 2013, and subsequent workers' compensation claim, concluded that Mr. Archuleta's back problems and related pain were solely the result of the injury he experienced while doing manual labor at his home in July 2013.  *Id.*  Dr. Wallach noted that Mr. Archuleta had not pursued acupuncture and instead was interested in trying more chiropractic adjustments.[12]  *Id.*

---

[12] On November 11, 2014, Mr. Archuleta presented to CareMore Chiropractic Centers.  Tr. 884-888.  Mr. Archuleta had twenty-four (24) chiropractic adjustments from November 11, 2014, through March 31, 2016 (14 in 2014; 8 in 2015; 2 in 2016).  Tr. 882-941.  On November 11, 2014, Robert Woodruff, DC, wrote, *inter alia,* that "Mr. Archuleta's prognosis is guarded.  I do feel optimistic that correcting subluxations of the spine will reduce pain, increase range of motion and reduce hypertonicity and spasm."  Tr. 910.  Mr. Archuleta was noted to be improving on ten occasions.  Tr. 893, 895, 897, 901, 903, 909, 911, 913, 915, 917.  On October 5, 2015, Mr. Archuleta reported going 4-5 days without pain before it "creeps up again."  Tr. 937.

**(3)**      **2015**[13]

On January 15, 2015, Mr. Archuleta reported he was overall stable and "maybe 10%

better than he was one month ago" and continued to have better tolerance with sitting, standing

and walking.  Tr. 1037-38.  Dr. Wallach indicated "[c]ontinue workplace restrictions up to

20 hours per week, no prolonged sitting or standing and no lifting greater than 10 pounds."  *Id.*

On March 31, 2015, Mr. Archuleta informed Dr. Wallach that he was offered a settlement

to close out his workers' compensation case that he was considering.  Tr. 1039-40.  He reported

that chiropractic adjustments were not having any major lasting benefit.  *Id.*  He reported that he

was doing somewhat better in terms of sitting, standing and walking and may have three good

days per week.  *Id.*  Dr. Wallach recommended that Mr. Archuleta continue with chiropractic

adjustments and recommended myofascial trigger point therapy.  *Id.*  Dr. Wallach indicated

"[c]ontinue workplace restrictions up to 20 hours per week, no prolonged sitting or standing and

no lifting greater than 10 pounds."  *Id.*

On June 5, 2015, Dr. Wallach noted that Mr. Archuleta was continuing to improve, was

doing myofascial trigger point and massage therapy,[14] and that his sitting tolerance had increased

to 30 minutes and standing to about 20 minutes.  Tr. 1041-42.  Mr. Archuleta also reported doing

more work around the house and being able to lift 20 pounds or so comfortably.  *Id.*  Dr. Wallach

---

[13] Also in 2015, on March 24, 2015, Mr. Archuleta presented to CNS Lynda Shey at Rio Abajo Family Practice, P.C., in Los Lunas, NM, for a "well man exam."  Tr. 951-56.  Mr. Archuleta denied musculoskeletal arthralgia(s), back pain, bone fracture, joint complaint, muscle weakness, myalgias, osteoporosis, stiffness and swelling.  Tr. 951.  On musculoskeletal exam, CNS Shey indicated, *inter alia,* overall good posture, ribs benign, spine benign, sacroiliac joint benign, right hip benign and left hip benign; left and right knees benign, ankles benign, feet benign, lower legs non-tender without crepitus or defects, thighs non-tender without crepitus or defects, feet non-tender without crepitus or defects, full strength in right and left LE and normal LE bulk and tone; normal gait.  Tr. 954.

[14] On April 30, 2015, Mr. Archuleta presented to Southwest Myotherapy.  Tr. 841.  Mr. Archuleta had twenty-nine (29) myotherapy sessions from April 30, 2015, through March 18, 2019.  Tr. 841-55, 1195-1208, 1254-55.

indicated that Mr. Archuleta reported he could still only do part-time, 20 hours per week work. *Id.*

On September 8, 2015, Mr. Archuleta reported doing reasonably well and that his standing tolerance was 20-25 minutes.  Tr. 1043-44.  Mr. Archuleta reported having two new foster children "which is basically his full-time work" and that he was not seeking employment outside the home.  *Id.*  Dr. Wallach noted that Mr. Archuleta was stable and making slow but steady progress.  *Id.*  Dr. Wallach encouraged Mr. Archuleta to do yoga.  *Id.*  Dr. Wallach indicated Mr. Archuleta's work restrictions would remain the same based on Mr. Archuleta's reported continued difficulty with standing more than 20-25 minutes and sitting about the same time.  *Id.*

On December 28, 2015, Mr. Archuleta reported being better with his standing and sitting tolerance about 30 minutes and able to lift 30 pounds comfortably.  Tr. 1045-46.  Mr. Archuleta also reported that custom orthotics reduced the frequency of pain in his buttocks to about 5 times per week.  *Id.*  Dr. Wallach indicated that "[d]isability paperwork was filled out indicating he can still work part-time 20 hours per week.  Based on what he told me today he could sit or stand about 30 minutes at a time."  *Id.*

### (4)    <u>2016</u>

On June 22, 2016, Mr. Archuleta reported that he is stable, but continued to struggle with chronic back pain.  Tr. 1047-48.  Mr. Archuleta reported that trying to do anything more than basic sedentary activities still resulted in increased back pain.  *Id.*  Dr. Wallach indicated he did not know why Mr. Archuleta has chronic back pain and encouraged him to continue yoga, that Pilates could be helpful, and to stay as active as possible.  *Id.*  Mr. Archuleta reported that he was still doing foster care and not seeking outside employment.  *Id.*

(5)     __2017__[15]

On February 14, 2017, Mr. Archuleta reported to Dr. Wallach that overall he was doing

relatively well.  Tr. 1049-50.  Mr. Archuleta reported that yoga was helping, as was myofascial

and massage therapy.  *Id.*  Mr. Archuleta reported that his standing tolerance was 30 minutes, his

walking tolerance was about 20 minutes, and his sitting tolerance was greater than 30 minutes.

*Id.*  Mr. Archuleta reported that he continued foster care work.  *Id.*  On physical exam,

Dr. Wallach indicated "[f]ocally tender to palpation around the posterior right greater trochanter

and also around the gluteal muscle attachments."  *Id.*  Dr. Wallach wanted to get an MRI of

Mr. Archuleta's right hip to see if there was any evidence of gluteal muscle tearing, tendinosis,

etc., to explain Mr. Archuleta's chronic symptoms.[16]  *Id.*

On March 20, 2017, Mr. Archuleta presented to Dr. Wallach to go over his MRI results.

Tr. 1052-53.  Mr. Archuleta reported a current pain level of 2/10.  *Id.*  Dr. Wallach informed

Mr. Archuleta that the MRI results demonstrated nothing abnormal.  *Id.*  Dr. Wallach instructed

Mr. Archuleta to follow up on an as needed basis.  *Id.*

(6)     __2018__[17]

---

[15] Also in 2017, on May 16, 2017, Mr. Archuleta presented to PA-C Catherine Delaney of Rio Abajo Family Practice, P.C., for a "well man exam."  Tr. 960-65.  Mr. Archuleta denied musculoskeletal arthralgia(s), back pain, bone fracture, joint complaint, muscle weakness, myalgias, osteoporosis, stiffness and swelling.  Tr. 960.  On musculoskeletal exam, CNS Shey indicated, *inter alia,* overall good posture, ribs benign, spine benign, sacroiliac joint benign, right hip benign and left hip benign; left and right knees benign, ankles benign, feet benign, lower legs non-tender without crepitus or defects, thighs non-tender without crepitus or defects, feet non-tender without crepitus or defects, full strength in right and left LE and normal LE bulk and tone; normal gait.  Tr. 963.

[16] On March 12, 2017, Mr. Archuleta had an MRI Hip – Right which was unremarkable.  Tr. 1051.

[17] Also in 2018, on February 5, 2018, Mr. Archuleta presented to FNP Tiara Muhr at Rio Abajo Family Practice, P.C. Tr. 947-50.  Mr. Archuleta presented with lower right leg calf pain after playing football.  Tr. 947.  Mr. Archuleta complained of pain in his right leg calf "but denied arthralgia(s), back pain, bone fracture, joint complaint, muscle weakness, osteoporosis, stiffness and swelling."  Tr. 947.

On April 2, 2018, Mr. Archuleta presented to PA-C Catherine Delaney at Rio Abajo Family Practice, P.C.  Tr. 943-46.  Mr. Archuleta presented with insomnia.  Tr. 943.  Mr. Archuleta also reported that he has problems with muscle tightness and that he has to see a chiropractor, myofascial therapist and massage therapist as well multiple times a month to control his pain and spasms.  *Id.*  Mr. Archuleta reported he "is not doing Yoga but is active daily."  *Id.*  On

14

On August 21, 2018, Mr. Archuleta reported to Dr. Wallach that his symptoms remained unchanged.  Tr. 1054-55.  Mr. Archuleta reported that he continues yoga and having myofascial, massage, and chiropractic therapy.  *Id.*  On physical exam, Dr. Wallach noted non-antalgic gait, normal coordination/balance, no assistive devices, and erect posture.  *Id.*  Dr. Wallach indicated full range of lumbar motion with no limitation of flexion, extension, side bending, or rotation. *Id.*  Dr. Wallach indicated tenderness to palpation of bilateral SI joint, and positive left and right Faber Test.  *Id.*  Mr. Archuleta wanted to discuss applying for disability and Dr. Wallach noted he did not have an opinion on that.  *Id.*  Dr. Wallach noted that Mr. Archuleta was still participating in the foster system in terms of a degree of employment but was currently not in the workforce outside the home.  *Id.*  Dr. Wallach indicated he did not know why Mr. Archuleta was experiencing chronic pain and wanted to do a basic rheumatoid lab screen to making sure he was not missing anything.[18]  *Id.*  Dr. Wallach indicated he would proceed with considering a diagnostic/therapeutic bilateral SI joint injection if blood work was normal.  *Id.*

---

musculoskeletal exam, PA-C Delaney noted, *inter alia*, tender at lumbar spine lower at L2 area as well as his SI, tender right sacroiliac joint and tender left sacroiliac joint.  Tr. 944.

On September 17, 2018, Mr. Archuleta presented to Duke City Urgent Care complaining of constant pain of lower back for four days.  Tr. 1211-13.  Mr. Archuleta reported onset of pain after going up and down 8 foot ladders.  *Id.* Mr. Archuleta reported his back pain was a recurrent problem.  *Id.*  Pain injections were administered.  *Id.*

On September 27, 2018, Mr. Archuleta presented to PC-C Delaney with complaints of back pain and "flare up" the past two weeks that moderately limits activities.  Tr. 966-68.  Mr. Archuleta reported that his symptoms are alleviated by chiropractic massage and that radiofrequency ablation helped his sciatic pain.  *Id.*  On musculoskeletal exam, PA-C Delaney noted, *inter alia*, tender at lumbar spine to palpation on his lower right has palpable mobile nodule or cyst., decreased flexion, decreased extension and full lateral bending, tender right sacroiliac joint and tender left sacroiliac joint.  Tr. 967.

[18] Laboratory studies were negative.  Tr. 1056-62.

**b.**    **Gary J. Coomber, M.D.**

**(1)**    **2018**

On October 4, 2018, Mr. Archuleta presented to Gary John Coomber, M.D., of

Presbyterian Healthcare Services.  Tr. 1268-69.  Mr. Archuleta was accompanied by a "young

boy about 6 years old" who Mr. Archuleta identified as his foster child.  *Id.*  Mr. Archuleta

reported a five-and-a-half-year history of hip and sacral region pains and wanted to get to the

source of his pain.  *Id.*  On physical exam, Dr. Coomber noted that Mr. Archuleta showed no

acute physical distress as he sat and related his health history and interacted with the young boy

in the room.  *Id.*  Dr. Coomber noted, *inter alia,* normal range of motion right hip, normal muscle

tone, and normal coordination.  *Id.*  Dr. Coomber assessed pain in right hip and ordered an MRI.

*Id.*

On November 27, 2018, Mr. Archuleta presented to Dr. Coomber and reported worse

pain in the piriformis and vicinity, right side.  Tr. 1266-67.  On physical exam, Dr. Coomber

indicated no edema or deformity and that Mr. Archuleta pointed to the right lateral rotator area as

the site of maximum pain and tenderness.  Tr. 1267.  Dr. Coomber assessed pain in right hip and

planned to follow-up on getting imaging of Mr. Archuleta's acetabulofemoral joints.  *Id.*

**(2)**    **2019**[19]

---

[19] Also in 2019, on July 1, 2019, Mr. Archuleta presented to VibrantCare for physical and aquatic therapy.  Tr. 1481.
Mr. Archuleta attended thirty-four (34) physical and/or aquatic therapy sessions from July 1, 2019, through January 7,
2020.  Tr. 1311-21, 1343-55, 1368-81; 1414-16, 1481; 1613-20.  On January 7, 2020, at discharge, Mr. Archuleta
reported "doing pretty good," that since having a piriformis injection three weeks earlier, "he can walk without his
cane, his pain is no longer constant and has improved numbness/tingling as well.  Pt says that he can now tolerate his
stretches and exercises and feels they are more effective."  Tr. 1619.

On July 21, 2019, Mr. Archuleta presented to State agency consultative medical examiner Cody Saxton, M.D.  Tr.
1302-10.  Dr. Saxton noted on physical exam, *inter alia,* that Mr. Archuleta had no palpable muscle spasms, normal
muscle strength, and normal muscle tone and bulk.  Tr. 1305.  Dr. Saxton also indicated

> palpation over sciatic nerves bilaterally.  The claimant was able to lift, carry and handle light objects.
> Claimant was able to squat and rise from that position with ease.  Claimant was able to rise from a
> sitting position with his arms and had difficulty getting up and down from the exam table.  The

16

On February 27, 2019, Mr. Archuleta reported chronic pain in his hip area, right much more than left.  Tr. 1265-66.  Dr. Coomber indicated that insurer had denied requested imaging diagnostics.  *Id.*  Mr. Archuleta reported he obtained pain injections at Urgent Care, that squatting position eased his pain, and that he continued to go to physical and massage therapy and have chiropractic adjustments which provides him with 2-3 days relief.  *Id.*  On physical exam, Dr. Coomber indicated that Mr. Archuleta was fairly animated and not in a great deal of physical distress and there was no clear-cut muscle spasm.  *Id.*  Dr. Coomber wanted

---

claimant was able to walk on heels but not toes.  Tandem walking was normal and claimant could hop on one foot bilaterally.  Claimant could dress and undress adequately well and was cooperative during the examination.

Tr. 1305-06.  Dr. Saxton indicated that Mr. Archuleta's range of motion was normal and sitting and supine straight leg tests were negative.  Dr. Saxton assessed a limitation with walking due to a "[m]arked antalgic gait, uses cane with limping gait."  Tr. 1307-08.  Dr. Saxton also noted that she was concerned about symptom magnification: "when distracted with eye exam, claimant doesn't have trouble sitting still.  Good muscle tone.  No atrophy.  Inconsistent effort in strength testing."  Tr. 1308.

On August 21, 2019, nonexamining State agency medical consultant William Fleming, M.D., reviewed the medical evidence record and assessed that Mr. Archuleta was capable of medium exertional capacity work.  Tr. 177-79.

On September 27, 2019, Mr. Archuleta presented to CNP Jason Mechenbier and complained of "zap" to his head, hip and leg which left him feeling disoriented.  Tr. 1341-43.  On physical exam, CNP Mechenbier indicated, *inter alia*, normal range of motion, normal strength, and normal coordination and gait.  Tr. 1342.

On October 15, 2019, Mr. Archuleta presented to DO Lori Eanes complaining of waxing and waning musculoskeletal pain for more than one year.  Tr. 1376.  On physical exam, DO Eanes indicated left hip with piriformis tender with hip flexor strength 3/5; antalgic unsteady gait without assist; left leg length discrepancy.  Tr. 1377.  She assessed sciatica, stable, and advised continued physical therapy.  *Id.*

On December 5, 2019, Mr. Archuleta presented to Daniel Junick, M.D., of New Mexico Orthopaedics, for evaluation of bilateral hip pain.  Tr. 1410-12.  On physical exam Dr. Junick noted assistive device, cane; right hip inspection normal; left hip inspection normal; pain in high hip trace; pain in left hip moderate; pain in low back severe.  Tr. 1411.  Diagnostic imaging was normal.  *Id.*  Dr. Junick indicated no significant abnormalities of the joints and referred him for chronic pain treatment.  Tr. 1412.

On December 9, 2019, Mr. Archuleta presented to Central New Mexico Counseling Services for depression related to his chronic pain.  Tr. 1444.  Mr. Archuleta stated his presenting concerns started in 2012.  *Id.*  Mr. Archuleta attended seven (7) counseling sessions over the course of ten months from December 9, 2019, through September 21, 2020.  Tr. 1437-44.

On December 31, 2019, nonexamining State agency medical consultant J. Chris Carey, M.D., reviewed the medical evidence record at reconsideration and assessed that Mr. Archuleta was capable of medium exertional capacity work.  Tr. 197-200.

17

Mr. Archuleta to go for plain x-rays if insurer will cover.  *Id.*  Dr. Coomber noted that "[w]ith regard to his state of disability, I have to harbor a bit of concern that he may be magnifying the degree of disability brought about by his hip pain."  *Id.*

On June 18, 2019, Mr. Archuleta reported a disappointing lack of improvement in the hip region pain.  Tr. 1324.  Mr. Archuleta explained that he was helping his father move one gallon paint cans after which his hip pain moved from his right hip to his left hip.  *Id.*  Dr. Coomber notes that an MRI scan of Mr. Archuleta's hips from May 9, 2019, showed no acute osseous abnormality.  *Id.*  Dr. Coomber noted that in the absence of any anatomic abnormality he would refer Mr. Archuleta for a neurology evaluation.[20]  *Id.*

On September 18, 2019, Mr. Archuleta presented for follow-up with Dr. Coomber.  Tr. 1346-48.  On physical exam, Dr. Coomber noted that Mr. Archuleta was standing and leaning against an exam table which Mr. Archuleta states helps to control his hip pain.  *Id.*  Dr. Coomber indicated he noted no tremors or weakness or asymmetry of gait or posture.  *Id.*  Dr. Coomber noted that Mr. Archuleta's mood was brighter.  *Id.*  Dr. Coomber assessed paresthesia of lower extremity and upper limb and pain in right hip and left leg.  *Id.*  Dr. Coomber wanted to try again for an MRI of lumbar spine and instructed Mr. Archuleta to follow up with neurologic consultation.  *Id.*

On November 25, 2019, Mr. Archuleta presented for follow-up with Dr. Coomber regarding his sciatica-like symptoms in the lower extremities.  Tr. 1601-02.  On physical exam,

---

[20] On June 21, 2019, Mr. Archuleta presented to Baljinder Sandhu, M.D., in an outpatient neurology clinic for evaluation of left lower extremity paresthesias.  Tr. 1322-23.  Mr. Archuleta reported numbness in his left foot sometimes moving up to his calf and gluteus muscles, along with constant 4/10 back pain.  *Id.*  On physical exam, Dr. Sandhu noted normal musculoskeletal range of motion, normal strength, normal gait, intact cranial nerves, 5/5 strength in all extremities (except for giveaway weakness in the left lower extremity), limping gait, and can walk on his tippy toes and heels.  *Id.*  Dr. Sandhu referred Mr. Archuleta for EMG nerve conduction studies, which demonstrated no sign of peripheral neuropathy.  Tr. 1323, 1371.

Dr. Coomber indicated no new outwardly visible hip deformity and no new focal low back tenderness or deformity.  *Id.*  Dr. Coomber indicated that Mr. Archuleta gets into a squatting position to relieve his pain.  *Id.*  Dr. Coomber supported adjustments to physical therapy directed more at muscles in the sacral and hip joint region.  *Id.*  Dr. Coomber signed off on Mr. Archuleta's request for a MVD disabled-person parking placard.  *Id.*

### (3)    <u>2020</u>

On February 21, 2020, Mr. Archuleta saw Dr. Coomber "on what has been diagnosed as piriformis syndrome."[21]  Tr. 1622-23.  Mr. Archuleta reported that physical and aqua therapy were beneficial and that he had an ultrasound-guided corticosteroid shot that relieved his pain for two and a half days.  *Id.*   Dr. Coomber assessed piriformis syndrome and said the next step was to get MRI imaging.  *Id.*

On March 15, 2020, Dr. Coomber signed off on a *Physical Residual Functional Capacity Questionnaire* on Mr. Archuleta's behalf.[22]  Tr. 1421-25.  This form represents that Dr. Coomber treated Mr. Archuleta monthly to quarterly for one and a half years; that Mr. Archuleta has right hip pain, piriformis syndrome, and left hip pain with a history of sciatica; that Mr. Archuleta experiences constant chronic and radiating 6/10 pain in his buttocks/sacrum on both sides that endures 75-80% of a 24-hour day; that Mr. Archuleta has reactive depression; and that Mr. Archuleta has difficulty standing in one position or ambulating for any length of time and has to squat to decompress sciatic nerves.  Tr. 1421.  Dr. Coomber assessed that as of October 4, 2018, Mr. Archuleta was (1) incapable of even "low stress" jobs due to consistent chronic pain

---

[21] On January 24, 2020, Mr. Archuleta presented to John R. Tranchida, M.D., of New Mexico Orthopaedics follow/up after left piriformis injection.  Tr. 1433-35.  Mr. Archuleta injection help him approximately 30%.  *Id.*  Dr. Tranchida included Piriformis Syndrome under his "Impression."  *Id.*  Dr. Tranchida ordered a lumbar spine MRI.  *Id.*

[22] Dr. Coomber indicated that Mr. Archuleta assisted with the filling out of the form and that Dr. Coomber agreed with the data entered and was willing to sign his name to the form.  Tr. 1424.

day/night; (2) can walk 0 blocks without rest or severe pain; (3) can sit for 5-10 minutes at one time; (4) can stand for 5-10 minutes at one time; (5) can sit/stand/walk less than 2 hours in an 8-hour working day; (6) needs to walk around for 5-10 minutes several times in an 8-hour working day; (7) requires numerous unscheduled breaks; (8) can rarely lift/carry less than 10 pounds; (9) can frequently look down and look up; (10) can occasionally turn head right or left or hold head in static position; (11) can occasionally crouch/squat; (12) can never twist, stoop, climb ladders or climb stairs; (13) has no limitations with reaching, handling or fingering; and (14) experiences mostly bad days due to his impairments.  Tr. 1422-24.

On May 23, 2020, Mr. Archuleta saw Dr. Coomber via a telephone appointment.  Tr. 1625-27.  Mr. Archuleta reported chronic hip pain persistent on the left side and transient on the right.  *Id.*  Dr. Coomber indicated that Mr. Archuleta was responding well to treatment for piriformis syndrome and was awaiting MRI imaging to better define the anatomy.  *Id.*  Dr. Coomber also indicated that he was taking over prescribing certain medications until care from other healthcare providers resumed.  *Id.*  Dr. Coomber assessed adjustment disorder with depressed mood due to chronic pain syndrome.  *Id.*

On August 30, 2020, Mr. Archuleta saw Dr. Coomber via a telephone appointment.  Tr. 1628-29.  Dr. Coomber noted that Mr. Archuleta is still waiting for insurance approval of MRI. *Id.*  Dr. Coomber prescribed a controlled substance, Lunesta, for Mr. Archuleta's reported insomnia.  *Id.*

### (4)   <u>2022</u>

On May 2, 2022, Dr. Coomber prepared a "To Whom It May Concern" letter as follows:

> It has been my privilege to serve as Primary Care Physician for Mr. Archuleta for the past 4 ½ years.  He came to me very recently with a simple request, for a letter to verify that he has a disabling hip disorder, and has needed a cane to ambulate any distance, for about the past eight years.

It remains a medical necessity for my patient to use a cane, for basic ambulation from place to place in his day-to-day life.

Tr. 1642.

### 2.    ALJ's Evaluations

#### a.    Dr. Wallach

The ALJ discussed Dr. Wallach's treating notes and opinion evidence as follows:

Robert S. Wallach, M.D., stated in 2015 and 2016 that the Claimant should be limited to working only 20 hours per week, should have no prolonged sitting or standing, and no lifting greater than 10 pounds.  Mr. Wallach further indicated that the Claimant could sit for 30 minutes before needing a 10-minute break and stand for 20 minutes before needing a five-to-ten minute break, and that he would have a very difficult time working even part-time.  (Ex. 10F/65-67, 71, 73; 11F/105).[23] Dr. Wallach's opinions are not persuasive, as they are inconsistent with the record and are not supported by Dr. Wallach's own objective findings.  Specifically, the record shows that the Claimant had ongoing pain, tenderness, and limited range of motion in his lumbar spine and bilateral hips, and an antalgic gait for which he used a cane for assistance at times.[24]  However, the record shows that the Claimant was able to improve his symptoms with conservative treatment, including non-narcotic pain medication, physical therapy, chiropractic care, massage therapy, and aqua therapy, that he only needed his cane intermittently and reported that he was able to walk without his cane following a piriformis injection, and that he also had improvement of his pain with walking and yoga.  The objective findings in the record also show[] that the Claimant had full strength and intact sensation in his extremities, normal range of motion in his neck, back, and extremities, negative straight leg raise testing, and normal range of motion throughout his musculoskeletal system.  Lastly, the record shows that the Claimant has reported playing football, walking to alleviate his pain, and providing care for his foster children, and the diagnostic imaging and testing shows that the Claimant has relatively mild degenerative changes in his hips and spine and no peripheral neuropathy.  (Exs. 4F/14; 6F/11; 9F/6-9, 12-13, 22-23, 25-26; 10F/62-63, 66, 70, 74, 76; 14F/10; 15F/11; 18F/10; 24F/3-7; 25F/3, 8-11; 27F/3; 32F/6-7; 40F/2-3, 16-

---

[23] Ex. 11F/105: Dr. Wallach January 15, 2015, Treatment Note – Tr. 1166-67; Ex. 10F/65: Dr. Wallach March 13, 2015, Treatment Note – Tr. 1039-40; Ex.10F/66-67:  Dr. Wallach June 5, 2015, Treatment Note – Tr. 1041-42; Ex. 10F/71: Dr. Wallach December 28, 2015, Treatment Note – Tr. 1045-46; Ex. 10F/73: Dr. Wallach June 22, 2016, Treatment Note – Tr. 1047-48.

[24] Dr. Wallach's treatment notes do not indicate at any time that Mr. Archuleta required the use of or was using a cane. Mr. Archuleta reported on August 30, 2019, that *as of May 21, 2019*, he had begun using a walking supportive tool for getting around.  Tr. 567.

17, 121-26, 160).[25]  While Claimant does experience some pain, the record shows
he has been able to manage his pain conservatively and does not require the use of
a cane at all times.  These objective findings show that Claimant is capable of light
exertional work with additional limitations, including the use of a cane [to]
ambulate so that he can use it during times of need.

Tr. 25-26.

### b.   Dr. Coomber

The ALJ discussed Dr. Coomber's treating notes and opinion evidence as follows:

Gary J. Coomber, M.D., completed a physical residual functional capacity
questionnaire, and indicated that the Claimant could sit for less than two hours and
stand/walk for less than two hours in an eight-hour workday, requires unscheduled
breaks, needs to elevate his legs with prolonged sitting, and could rarely lift less
than 10 pounds.  Dr. Coomber further stated that the Claimant could occasionally
crouch/squat but could never perform any other postural activity, and that the
Claimant would miss more than four days of work per month.  Dr. Coomber stated
that these limitations started on October 4, 2018 (Ex. 34F).  Dr. Coomber also wrote

---

[25] Ex. 4F/14: FNP Kathy Fresquez-Chavez August 4, 2014, Treatment Note – Tr. 790-93, *see* fn. 7, *supra*;
Ex. 6F/11: PT August 19, 2014, Treatment Note (walked ½ mile and did well) – Tr. 825; Ex. 9F/6-9: FNP Tiara Muhr
February 5, 2018, Treatment Note (calf pain after playing football) – Tr. 947-50; Ex. 9F/12-13: CNS Shey March 24,
2015, Treatment Note (benign musculoskeletal exam, full LE strength, normal gait) – Tr. 951-56; Ex. 9F/22-23: PA-
C Delaney May 16, 2017, Treatment Note (benign musculoskeletal exam, full LE strength, normal gait) – Tr. 960-65;
Ex. 9F/25-26: PA-C Delaney September 27, 2018, Treatment Note (back pain flare up; symptoms alleviated by
chiropractic massage) – Tr. 966-68; Ex. 10F/62-63: Dr. Wallach January 15, 2015, Treatment Note (slowly improving,
continue workplace restrictions) – Tr. 1037-38; Ex. 10F/66: Dr. Wallach June 5, 2015, Treatment Note (continuing to
improve, sitting tolerance 30 minutes; standing 20 minutes then break) – Tr. 1041-42; Ex. 10F/70: Dr. Wallach
December 28, 2015, Treatment Note (standing tolerance a solid 30 minutes, sitting tolerance 30 minutes, can lift 30
pounds comfortably, noted decrease in frequency of pain with custom orthotics) – Tr. 1045; Ex. 10F/74: Dr. Wallach
February 14, 2017, Treatment Note (doing relatively well, pursuing yoga which is helpful; standing 30 minutes;
walking 20 minutes; sitting greater than 30 minutes; continues foster care) – Tr. 1049; Ex. 10F/76: Unremarkable MRI
of the hip – Tr. 1051; Ex. 14F/10: Mild degenerative changes at C5-C6, C6-C7, otherwise normal cervical spine – Tr.
1223; Ex. 15F/11: Dr. Wallach August 21, 2018, Treatment Note (non-antalgic gait, normal coordination/balance, no
assistive device, full lumber range of motion with no limitation; tenderness to palpation of SI joints and gluts) – Tr.
1239; Ex. 18F/10: Dr. Coomber October 4, 2018, Treatment Note (no distress as he sits and relates with young boy in
the room; normal range of motion right hip) – Tr. 1269; Ex. 24F/3-7: CE Cody Saxton, M.D., July 21, 2019, Report
(uses cane with limping gait; concern for symptoms magnification; good muscle tone; inconsistent effort in strength
testing) – Tr. 1302-09; Ex. 25F/3, 8-11: August 15, 2019, and July 16, 2019, Aquatic and Physical Therapy (pain
levels the same; improved ability to perform exercise consistently; slow, antalgic gait; decreased spinal ROM,
intermittent use of cane) – Tr. 1312, 1317-20; Ex. 27F/3: CNP Mechenbier September 27, 2019, Treatment Note
(normal musculoskeletal range of motion; normal strength; normal muscle tone; normal coordination and gait) – Tr.
1342; Ex. 32F/6-7: Daniel Junick, M.D., December 5, 2019, Treatment Note (use of cane; right gait normal; left gait
antalgic; radiographs of hips normal; MRI of right hip unremarkable) – Tr. 1411; Ex. 40F/2-3: Dr. Coomber
February 27, 2019, Treatment Note (fairly animated, not in a great deal of physical distress; concern he may be
magnifying degree of disabling hip pain) – Tr. 1461; Ex. 40F/16-17: Right Hip MRI (unremarkable) – Tr. 1475-76;
Ex. 40F/121-26 November 5, 2019, EMG Testing (normal) – Tr. 1580-85; Ex. 40F/160: PT January 7, 2020,
Treatment Note (states that since piriformis injection three weeks ago can walk without cane, pain no longer constant,
can tolerate stretches and exercises) – Tr. 1619.

a letter stating that it was a medical necessity for the Claimant to use a cane for basic ambulation (Ex. 43F).  I find Dr. Coomber's opinion from Exhibit 34F not persuasive as his extreme limitations are not supported by his own findings and are inconsistent with the record.  Specifically, the record shows that the Claimant has experienced some pain in his back and hips, and has had difficulty with his gait that requires the use of a cane at times, but overall he has been able to improve his pain and symptoms with use of non-narcotic pain medication and therapy.  The record further shows that he only needed his cane intermittently and reported that he was able to walk without his cane following a piriformis injection, and that he also had improvement of his pain with walking and yoga.  The objective findings in the record also shows that the Claimant had full strength and intact sensation in his extremities, normal range of motion in his neck, back, and extremities, negative straight leg raise testing, and normal range of motion throughout his musculoskeletal system.  Lastly, the record shows that the Claimant has reported playing football, walking to alleviate his pain, and providing care for his foster children, and the diagnostic imaging and testing shows that the Claimant has relatively mild degenerative changes in his hips and spine and no peripheral neuropathy.  (Exs. 4F/14; 6F/11; 9F/6-9, 12-13, 22-23, 25-26; 10F/62-63, 66, 70, 74, 76; 14F/10; 15F/11; 18F/10; 24F/3-7; 25F/3, 8-11; 27F/3; 32F/6-7; 40F/2-3, 16-17, 121-26, 160).[26]  While the claimant does experience some pain, the record shows he has been able to manage his pain conservatively and does not require the use of a cane at all times.  These objective findings show that the Claimant is capable of light exertional work with additional limitations, including the use of a cane [to] ambulate so that he can use it during times of need.

Tr. 26-27.

3.    **Arguments**

a.    **Dr. Wallach**

Mr. Archuleta argues that Dr. Wallach is the preparer of a July 16, 2014, work-related restrictions form and that his opinion from that date, and subsequent treatment notes from 2015 and 2016, support that Mr. Archuleta was unable to work during the relevant period of time.[27]

---

[26] *See* fn. 25, *supra*.

[27] On July 16, 2014, an unidentified provider completed a work-restriction form related to Mr. Archuleta's November 7, 2013, work-related injury and worker's compensation claim.  Tr. 1428-31.  The first page of the form reflects that the treating physician is "Knaus."  Tr. 1428.  A physician signature appears on the first and last page of the form but is illegible.  On the first page, the provider indicated under "Work Status" that Mr. Archuleta was unable to work from June 30, 2014, to "TBD," and under "Restrictions" checked the "no lifting" box under the "Back" heading.  Tr. 1428.  On the second and third pages of the form, the provider indicated under "Medical Facts" that he/she had treated Mr. Archuleta on four occasions; that Mr. Archuleta would need treatment visits at least twice per year due to his condition; that medication and physical therapy had been prescribed; and that Mr. Archuleta was unable

Doc. 17 at 12-15.  As to the July 16, 2014, opinion, Mr. Archuleta argues that the ALJ only

discussed the first page of the opinion, and that this amounts to picking and choosing from the

evidence and demonstrates the ALJ erred in his duty to consider the degree to which the July 16,

2014, opinion was supported by relevant evidence and consistent with the record as a whole.[28]

*Id.*  Mr. Archuleta further argues that the ALJ's parsed and incomplete review of the July 16,

2014, opinion violates the ALJ's duty to fully evaluate medical opinion evidence even when it

addresses issues reserved for the Commissioner, *i.e.,* whether a claimant is disabled or not.

  Mr. Archuleta next argues that the ALJ's evaluation of whether Dr. Wallach's treatment

notes from 2015 and 2016 are internally supported and consistent with the medical evidence

record is deficient and ignores the medical evidence.  *Id.*  As to supportability, Mr. Archuleta

argues that the ALJ's evaluation is limited to only certain of Dr. Wallach's treatment notes and

that he failed to discuss contradictory evidence.  *Id.*  Citing additional records, Mr. Archuleta

argues that viewed as a whole Dr. Wallach's treatment notes internally support his work-

preclusive opinions.  *Id.*  As to consistency, Mr.  Archuleta argues that the ALJ uses limited

instances of waxing and waning of symptoms to support his finding that Dr. Wallach's findings

---

to perform his job functions because he could not sit for longer than 10 minutes.  Tr. 1429-30.  Other relevant medical
information included that Mr. Archuleta experienced markedly increased pain following an injection procedure.  *Id.*
The provider indicated under "Amount of Leave Needed" that Mr. Archuleta was incapacitated for a single continuous
period of time for approximately one month beginning June 30, 2014, and ending August 1, 2014.  *Id.*  The provider
indicated that Mr. Archuleta's inability to sit for longer than 10 minutes could necessitate follow-up treatment or work
part-time or on a reduced schedule, and that his condition could cause episodic flare-ups if Mr. Archuleta were unable
to sit or concentrate due to pain.  Tr. 1430.

[28] The ALJ addressed the July 16, 2014, opinion related to Mr. Archuleta's work-related injury and work limitations
as follows:

> Finally, I note that the record contains some apparent temporary no-work restrictions from 2014 by
> an unidentified provider (Ex. 36F).  The opinion that the Claimant is unable to work is a
> determination reserved for the Commissioner of the Social Security Administration, and Social
> Security Administration regulations indicate that a statement such as this are inherently neither
> valuable nor persuasive (20 CFR 404.1520b(c)(3)).

Tr. 29.

were inconsistent with other evidence in the record.  *Id.*  Mr. Archuleta argues, however, that

treatment notes from other providers documented Mr. Archuleta's subjective complaints of pain

and associated limitations and noted objective findings in support thereof.  *Id.*

Last, Mr. Archuleta argues that the ALJ failed to discuss Dr. Wallach's treatment

relationship with Mr. Archuleta and Dr. Wallach's medical specialization, two factors that

demonstrate Dr. Wallach's opinions were well founded.  *Id.*

The Commissioner asserts that the ALJ gave several legitimate reasons why he found

Dr. Wallach's work-preclusive opinions and exertional limitations not persuasive, and that

Mr. Archuleta essentially is asking the Court to reweigh the evidence.  Doc. 23 at 8-12.  As to

the July 16, 2014, work restrictions form, the Commissioner asserts Mr. Archuleta's argument is

misplaced because the form predates the relevant period at issue and gives no indication that it

applies during the relevant period of time.[29]  *Id.*  That aside, the Commissioner asserts, and

Mr. Archuleta concedes, that the July 17, 2014, work restriction form opines on an issue reserved

for the Commissioner.  *Id.*  Further, the Commissioner asserts that even if the assessed work

restrictions related to the relevant period and were offered by Dr. Wallach, any failure by the

ALJ to specifically address the assessed functional limitations therein, *i.e.,* Mr. Archuleta's

inability to lift and inability to sit for more than ten minutes, was cured when the ALJ considered

and rejected similar limitations from Dr. Wallach's 2015 and 2016 treatment notes.  *Id.*

As to Mr. Archuleta's arguments regarding supportability and inconsistency, the

Commissioner asserts that the ALJ cited Dr. Wallach's treatment notes where Mr. Archuleta

reported improvements, where Dr. Wallach's physical exam findings were unremarkable, and

---

[29] The Commissioner asserts that it is unclear who authored the Department of Labor work restriction form as there is no physician name anywhere on its four pages and only two illegible signatures.  Doc. 23 at 10.

where Dr. Wallach encouraged Mr. Archuleta to, *inter alia*, "stay as active as possible." *Id.* The Commissioner further asserts that the records Mr. Archuleta's cites either predate the relevant period of time, were discussed by the ALJ, or are duplicative of records the ALJ addressed. *Id.* The Commissioner also asserts that the ALJ explained that Dr. Wallach's opinions were inconsistent with the longitudinal record which demonstrates normal findings on physical exams, unremarkable findings on objective testing and imaging, reports of relief from various treatment modalities, and admitted activities that were inconsistent with Dr. Wallach's opinion, *i.e.,* playing football, walking for exercise, and caring for foster children in lieu of outside employment. *Id.*

Lastly, the Commissioner asserts that an ALJ may, but is not required, to explain how less important factors such as treatment relationship and specialization play into his findings on an opinion's persuasiveness. *Id.* As such, the Commissioner asserts that any failure by the ALJ to discuss those factors is not a basis for remand. *Id.*

### b.   Dr. Coomber

Mr. Archuleta argues that in the ALJ's supportability discussion of Dr. Coomber's opinion, the ALJ made the blanket statement Dr. Coomber's opinion was not supported by his own findings but does not specifically cite to any of Dr. Coomber's findings that contradict the "extreme" limitations. Doc. 17 at 17-22. Mr. Archuleta further argues that Dr. Coomber's treatment notes, as well as treatment notes from other providers, demonstrate both support and consistency regarding Dr. Coomber's opinion regarding Mr. Archuleta's symptoms and limitations and his inability to work due to his physical limitations. *Id.*

Mr. Archuleta similarly argues that the ALJ failed to discuss Dr. Coomber's treatment relationship with Mr. Archuleta and Dr. Coomber's medical specialization, two factors that demonstrate Dr. Coomber's opinion was well founded.  *Id.*

The Commissioner asserts that contrary to Mr. Archuleta's argument the ALJ specifically discussed two of Dr. Coomber's treatment notes to support his evaluation of Dr. Coomber's opinion, *i.e.,* one from October 2018 in which Dr. Coomber noted that Mr. Archuleta had normal range of motion and strength in his hips and no tenderness, and the other from February 2019 in which Dr. Coomber indicated Mr. Archuleta was fairly animated, not in distress, and that he was concerned Mr. Archuleta was magnifying the degree of disability brought on by his hip pain. Doc. 23 at 13.  The Commissioner asserts that the ALJ also addressed the inconsistencies between Dr. Coomber's outlier opinion and the longitudinal record which demonstrates frequently normal findings on physical exam, the absence of objective findings, reported relief from certain treatment modalities, and Mr. Archuleta's admitted activities.

The Commissioner similarly asserts that an ALJ may, but is not required, to explain how less important factors such as treatment relationship and specialization play into his findings on an opinion's persuasiveness.  *Id.*  As such, the Commissioner asserts that any failure by the ALJ to discuss those factors is not a basis for remand.  *Id.*

### 4.   <u>Legal Standard and Analysis</u>

The ALJ evaluates the persuasiveness of medical opinions based on: (1) the degree to which the opinion is supported by objective medical evidence and supporting explanation; (2) how consistent the opinion is with other evidence in the record; (3) the source's treating relationship with the claimant (*i.e.,* how long/frequently the source treated the claimant and for what purpose); (4) whether the source was specialized on the impairment on which he/she is

opining; and (5) any other factor tending to support or contradict the opinion.  20 C.F.R. § 404.1520c(c)(1)-(5).  Supportability and consistency are the most crucial factors.  20 C.F.R. § 404.1520c(b)(2).  And, importantly, an ALJ is not required to articulate how the other (less important) factors played into his finding on an opinion's persuasiveness.  *Id.* ("We may, *but are not required to*, explain how we considered the factors in paragraphs (c)(3) through (7) of this section, as appropriate, when we articulate how we considered the medical opinions and prior administrative medical findings from acceptable medical sources in your case record." (emphasis added)).  An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c(a).

In considering the persuasiveness of medical opinions, the ALJ "must discuss the weight he assigns." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  The ALJ need not discuss each factor articulated in the regulations; rather, the ALJ must merely explain his weighing decision with sufficient specificity so as to be capable of review.  *See Langley*, 373 F.3d at 1119.  Put differently, if the ALJ rejects an opinion, he "must then give 'specific, legitimate, reasons for doing so.' " *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).

Applying this legal standard and for the reasons explained below, the Court finds that the ALJ properly evaluated the medical opinion evidence and that his reasons for finding both Dr. Wallach's and Dr. Coomber's opinions not persuasive are supported by substantial evidence.

a.      **Dr. Wallach**

As an initial matter, it is not clear to the Court that the July 17, 2014, work restrictions

form was authored by Dr. Wallach as Mr. Archuleta argues.[30]  But the authorship is irrelevant

because, as the Commissioner points out, the opinion predates the relevant period of time at issue

here.  That aside, the ALJ did not ignore the opinion, but properly stated that it opined on issues

reserved to the Commissioner for which he need not provide any analysis.  *See Mayberry v.*

*Astrue*, 461 F. App'x 705, 708 (10th Cir. 2012) ("[u]nder the controlling regulations, the final

responsibility for deciding the ultimate issue of whether a social security claimant is 'disabled' or

'unable to work' is reserved to the Commissioner."); *see also* 20 C.F.R. § 404.1520b(c)

(explaining that for claims filed on or after March 27, 2017, statements that an individual is able

or unable to work or which fail to provide descriptions of a claimant's "functional abilities and

limitations" are categorized as "[s]tatements on issues reserved to the Commissioner" and

"inherently neither valuable nor persuasive," and the ALJ need not provide any analysis as to

how he considered such statements).  Given the governing regulations, the Court finds no error

in the ALJ's cursory acknowledgement of the July 17, 2014, work restrictions form.

That said, the ALJ nonetheless addressed similar exertional limitations and work-related

restrictions found in Dr. Wallach's treatment notes and articulated sufficient reasons for rejecting

them.  From Mr. Archuleta's alleged onset date of August 1, 2014, through August 21, 2018,

Mr. Archuleta saw Dr. Wallach eleven (11) times.[31]  *See* Section A.1.a., *supra*.  In his decision,

the ALJ specifically cites and discusses five of these eleven treatment notes and concluded that

---

[30] *See* fn. 27, *supra*.

[31] Mr. Archuleta first presented to Dr. Wallach on December 4, 2013, and saw him five times before his alleged
onset date of August 1, 2014.  *See* Section A.1.a., *supra*.

while they reflect Mr. Archuleta's subjective reports and sometimes remarkable physical exam findings of, *inter alia*, "ongoing pain, tenderness, and limited range of motion in his lumbar spine and bilateral hips," the same records also demonstrate normal findings on physical exams, unremarkable findings on objective testing and imaging, reports of relief from various treatment modalities, and admitted activities that were inconsistent with work-related restrictions. The record supports these findings. *Id.*

In rebuttal, Mr. Archuleta cites the same records relied on by the ALJ, along with citing additional treatment notes Dr. Wallach prepared in 2013 and 2014, to argue Dr. Wallach's treatment notes in fact support Mr. Archuleta's subjective complaints, functional limitations, and inability to work. Mr. Archuleta argues that for the ALJ to have found otherwise demonstrates the ALJ engaged in improper picking and choosing from Dr. Wallach's treatment notes to support his evaluation. The Court disagrees.

As to the former, the additional record evidence Mr. Archuleta cites is not supportive of his position, as it consists primarily of his subjective complaints of pain and related symptoms and is either silent on or fails to contain contradictory objective findings not addressed by the ALJ. Tr. 980-92, 998, 1008-09, 1012-13, 1019-20, 1024-25, 1031-32. Moreover, inasmuch that Mr. Archuleta cites objective medical evidence, his argument remains unavailing as it functions as an invitation to reweigh the evidence before the ALJ, contrary to the charge of the applicable standard of review. *See Deherrera v. Comm'r, SSA*, 848 F. App'x 806, 808 (10th Cir. 2021) (setting out the reviewing court's standard of review and noting that it does not "reweigh the evidence or retry the case"). Recently, the Tenth Circuit eschewed the same type of request:

> [Claimant] advances several individual criticisms of the ALJ's analysis of the evidence, asserting that the medical evidence could have supported a finding of greater disability.... But while these arguments may show the ALJ could have

interpreted the evidence to support a different outcome, they, at most, amount to invitations to reweigh the evidence, which [the reviewing court] cannot do.

*Deherrera*, 848 F. App'x at 810.

As to the latter, it is undisputed that the Tenth Circuit instructs that ALJs cannot "pick and choose" individual findings from an *uncontradicted* medical opinion to support a finding of non-disability while ignoring the rest of the opinion.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir. 2004); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).  Here, however, Dr. Wallach's opinion evidence is not uncontradicted as other medical opinion evidence demonstrates greater exertional capacity than the exertional limitations and work-related restrictions noted in Dr. Wallach's treatment notes.[32]  That aside, the prohibition on "picking and choosing" does not mean ALJs cannot make a finding of non-disability after weighing all probative evidence on either side of the issue and finding the evidence of non-disability more persuasive as the ALJ did here.

As for Mr. Archuleta's inconsistency argument, he similarly argues that contrary to the ALJ's conclusion the medical evidence record as a whole in fact demonstrates consistency with Dr. Wallach's exertional limitations and work-related restrictions.  In support, Mr. Archuleta cites numerous therapy records and treatment notes from other providers and argues they

---

[32] *See* fn. 19, *supra* (nonexamining and examining state agency medical consultants assessed greater exertional capacity).  Additionally, Mr. Archuleta's reliance on the exertional limitations and work-related restrictions Dr. Wallach noted in his treatment notes overlooks that they were largely based on Mr. Archuleta's subjective reports and not the result of functional assessment exams Dr. Wallach performed.  *See* Section A.1.a, *supra.*  The record also demonstrates that on July 16, 2014, Dr. Wallach noted he thought Mr. Archuleta might be able to go back to work in a few weeks, "possibly part-time initially" (Tr. 1012-13); on August 21, 2014, Dr. Wallach encouraged Mr. Archuleta to speak with his employer about remote working options (Tr. 1024-25); on September 8, 2015, Dr. Wallach noted that Mr. Archuleta reported having two new foster children "which is basically his full-time work," and that Mr. Archuleta was not seeking employment outside the home (Tr. 1043-44); on June 22, 2016, Mr. Archuleta reported that he was still doing foster care and not seeking outside employment (Tr. 1047-48); on February 14, 2017, Mr. Archuleta reported he continued foster care work (Tr. 1049-50); and on August 21, 2018, when Mr. Archuleta wanted to discuss applying for disability, Dr. Wallach informed Mr. Archuleta he did not have an opinion on that (Tr. 1054-55).

demonstrate Mr. Archuleta's consistent subjective complaints, adverse objective findings, and that he obtained only temporary relief from various treatment modalities.  Mr. Archuleta's argument, however, suffers the same defect as previously discussed in that it asks this Court to reweigh the evidence which it cannot do.  Here, while not discussing every piece of evidence, the ALJ's determination demonstrates he considered all the evidence, including probative evidence that he rejected.  *See* fn. 25, *supra*.  In doing so, the ALJ concluded that the medical evidence record as a whole was inconsistent with the exertional limitations and work-related restrictions found in Dr. Wallach's treatment notes.  The Court, therefore, finds no error.

Last, Mr. Archuleta's argument that the ALJ erred by not discussing certain lesser factors in his evaluation necessarily fails because the regulations clearly provide that "[w]e may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record."  20 C.F.R. § 1520c(b)(2).  As such, the Court finds no error.

In sum, the Court rejects Mr. Archuleta's argument that the ALJ failed to properly evaluate Dr. Wallach's opinion or to provide legitimate reasons for determining it was not persuasive.

### b.    Dr. Coomber

Mr. Archuleta similarly argues that the ALJ engaged in picking and choosing and ignored medical evidence to conclude that Dr. Coomber's opinion was not supported by objective medical evidence and inconsistent with other evidence in the record.  The Court disagrees.

Mr. Archuleta saw Dr. Coomber seven times from October 4, 2018, through February 21, 2020, after which Dr. Coomber signed off on a *Physical Residual Functional Capacity Questionnaire*.[33]  Mr. Archuleta first argues that the ALJ failed to address any of Dr. Coomber's records to support his finding of nonsupportability.  Mr. Archuleta's argument, however, overlooks the ALJ's discussion of two of Dr. Coomber's treatment notes elsewhere in his determination.  For example, the ALJ discussed that on October 4, 2018, Mr. Archuleta presented to Dr. Coomber, who noted on physical exam that although he reported pain, Mr. Archuleta had normal range of right hip motion, no tenderness, and normal strength.  Tr. 23.  Dr. Coomber also noted at that visit that Mr. Archuleta was accompanied by a six-year-old boy, his foster child, and that while accounting his health history Mr. Archuleta showed no acute physical distress as he sat and interacted with the child.  Tr. 1268-69.  The ALJ also discussed Dr. Coomber's February 27, 2019, treatment note in which Dr. Coomber indicated that Mr. Archuleta was fairly animated and not in a great deal of distress, that there was no clear-cut muscle spasm, and that he was concerned that Mr. Archuleta was magnifying the degree of disability brought about by his reported hip pains.  Tr. 23.  These records support the ALJ's conclusion.  Additionally, while decrying the ALJ's failure to cite any records, which is incorrect, Mr. Archuleta does not cite, nor does the Court's meticulous review of the evidence reveal, that any of Dr. Coomber's treatment notes prior to February 21, 2020, contain objective evidence directly supporting the limitations found in the March 15, 2020, questionnaire.  *See* Section A.1.b., *supra*.

---

[33] *See* fn. 22, *supra*.  This questionnaire is dated after Mr. Archuleta's date of last insured, but indicates the assessed limitations are as of October 4, 2018.  Tr. 1421-25.  Mr. Archuleta's alleged onset date is August 1, 2014.  Tr. 545.

As for Mr. Archuleta's argument regarding inconsistency, Mr. Archuleta relies not entirely but heavily on Dr. Wallach's treatment notes as evidence of his subjective complaints of pain, his minimal improvement with various therapies, his reported exertional limitations, and that he requires the use of cane to ambulate.[34]  Doc. 17 at 22.  However, as previously discussed, the Court finds that while the ALJ did not discuss every piece of evidence, the ALJ's determination demonstrates he considered all the evidence, including probative evidence that he rejected.  *See* fn. 25, *supra*.  Mr. Archuleta's argument, therefore, is an invitation to reweigh the evidence before the ALJ which the Court cannot do.  The Court, therefore, finds no error with the ALJ's conclusion that the medical evidence record as a whole is inconsistent with the assessed functional limitations signed off on by Dr. Coomber.

Last, Mr. Archuleta's argument that the ALJ erred by not discussing certain lesser factors in concluding that Dr. Coomber's opinion was not persuasive necessarily fails because the regulations clearly provide that "[w]e may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record."  20 C.F.R. § 1520c(b)(2).  As such, the Court finds no error with the ALJ's lack of explanation as to how he considered additional factors in his evaluation.

---

[34] On May 2, 2022, Dr. Coomber prepared a "To Whom It May Concern" letter at Mr. Archuleta's request to verify that Mr. Archuleta required the use of a cane for the past *eight years*.  Tr. 1642.  None of Dr. Coomber's treatment notes from 2018-2020 indicate that Mr. Archuleta was using a cane.  *See* Section A.1.b., *supra*.  Similarly, none of Dr. Wallach's treatment notes indicate that Mr. Archuleta was using a cane.  *See* Section A.1.a., *supra*.  Further, on August 30, 2019, when Mr. Archuleta requested reconsideration of his disability claim, Mr. Archuleta reported to the Social Security Administration that *as of May 21, 2019*, he had begun using a walking supportive tool for getting around.  Tr. 567 (emphasis added); *see also* Tr. 1322-23 (on June 21, 2019, Neurologist Baljinder Sandhu does not indicate that Mr. Archuleta was using a cane); Tr. 1302-09 (on July 21, 2019, CE Cody Saxton, M.D., indicated Mr. Archuleta was using a cane with limping gait); Tr. 1312 1317-20 (on August 15, 2019, and July 16, 2019, PT Treatment notes indicated Mr. Archuleta report intermittent use of cane); Tr. 1410-12 (on December 5, 2019, Daniel Junick M.D., noted Mr. Archuleta was using an assistive device); Tr. 1619 (on January 7, 2020, PT Treatment Note indicated that since piriformis injection three weeks ago Mr. Archuleta can walk without cane, pain no longer constant, can tolerate stretches and exercises).

34

### B.     The ALJ Properly Considered Mr. Archuleta's Depression in Assessing the RFC

#### 1.     Relevant Mental Impairment Evidence

##### a.     Bella Vida Healthcare Clinic

On October 15, 2013, Mr. Archuleta reported to FNP Kathy Fresquez-Chavez that he was doing great with his antidepressant and that his mood was great.  Tr. 784.

On November 4, 2013, Mr. Archuleta presented to FNP Fresquez-Chavez for lab results.  Tr. 787-89.  Mr. Archuleta denied anxiety or depression.  *Id.*  On mental status exam, FNP Fresquez-Chavez noted, *inter alia*, that Mr. Archuleta was oriented to person, place, and time; speech was fluent and clear; thought processes were coherent; insight good; and higher cognitive functions were intact.  *Id.*  She noted his mood was depressed. *Id.*

##### b.     Rio Abajo Family Practice, P.C.

On November 4, 2016, Mr. Archuleta presented to FNP-BC Tiara Muhr, with complaints of insomnia.  Tr. 969-72.  Mr. Archuleta's PHQ9 Depression Screen score was 5, which indicated "minimal or no depression" and that no further action was required.  Tr. 971.

On February 5, 2018, Mr. Archuleta presented to FNP-BC Tiara Muhr, with complaints of lower leg pain.  Tr. 947-950.  Mr. Archuleta's PHQ9 Depression Screen score was 6, which indicated "minimal or no depression" and that no further action was required.  Tr. 949.

##### c.     Reconsideration

On August 18, 2019, at reconsideration, Mr. Archuleta reported that as of May 21, 2019, his "[d]epression and level of concentration has been affected due to consistent pain which I am

currently taking medication for the depression." Tr. 567.  Mr. Archuleta reported that his

"depression has worsened and the medication dosage had to be increased from 30mg to 60 mg.

My level of concentration and focus has decreased due to the constant chronic pain I feel every

moment of 'every day.' " Tr. 571.  Mr. Archuleta reported having lost weight due his level of

depression and chronic pain and requiring encouragement with his personal needs and grooming.

Tr. 572.

### d.      Administration Inquiry

On November 26, 2019, Social Security Administration investigator Sabra Taylor

contacted Mr. Archuleta to inquire about his depression and Mr. Archuleta stated that he was on

Cymbalta and that his depression comes and goes.  Tr. 582.  He reported that Dr. Coomber put

him on Cymbalta for his hip pain but told him it would help with depression as well.  *Id.*  He

stated that his depression is because of his physical problems, which don't seem to end.  *Id.*

Asked if he was told that he should perhaps speak with a mental health professional, Mr.

Archuleta stated that he had not been told that.  *Id.*  Asked if he felt his depression would keep

him from working, Mr. Archuleta said he wouldn't be depressed if he wasn't disabled.  *Id.*  Mr.

Archuleta reported he had not been hospitalized for any mental health problems.  Tr. 582

### e.      Central New Mexico Counseling Services

On December 9, 2019, Mr. Archuleta presented to Central New Mexico Counseling

Services for depression related to his chronic pain.  Tr. 1444.  Mr. Archuleta stated his presenting

concerns started in 2012.  *Id.*  Mr. Archuleta reported no previous behavioral health treatment

and no medication history.  *Id.*  On mental status exam, LCSW Julia Eddy indicated clean and

neat appearance, normal motor activity, depressed mood, appropriate affect, realistic self-

concept, normal speech, reported pain fog, normal sensory orientation, normal memory, normal

intellectual capacity and estimated intelligence, partial judgment and impulse control, and fair

insight. Tr. 1452. LCSW Eddy assessed mixed adjustment disorder. Tr. 1453.

Mr. Archuleta attended seven (7) counseling sessions over the course of ten

months from December 9, 2019, through September 21, 2020, with focused treatment on

self-care and positivity. Tr. 1437-44.

### f.  Lisa Swisher, Ph.D.

On December 16, 2019, nonexamining psychological consultative examiner Lisa

Swisher, Ph.D., reviewed the medical evidence record at reconsideration. Tr. 195-96.

Dr. Swisher prepared a Psychiatric Review Technique and rated the degree of Mr. Archuleta's

mental impairments in the area of understanding, remembering, or applying information as *mild*;

in the area of interacting with others as *mild*; in the area of maintaining concentration,

persistence and pace as *mild*; and in the area of adapting as *none*. *Id.* She assessed that

Mr. Archuleta's alleged mental impairment was non-severe. *Id.* Dr. Swisher, therefore, did not

prepare a Mental Residual Functional Capacity Assessment.

### 2.  Arguments

Mr. Archuleta argues that the ALJ erred when he found Mr. Archuleta's depression

nonsevere at step two. Doc. 17 at 23-25. Mr. Archuleta also argues that the ALJ erred by failing

to incorporate limitations in the RFC related to Mr. Archuleta's ability to do work-related mental

activities at step four despite frequent references to Mr. Archuleta's depression in the record.

The Commissioner asserts that the ALJ reasonably determined that

Mr. Archuleta's depression was not severe at step two and did not require workplace

limitations at step four. Doc. 23 at 18-21.

3.      <u>**Legal Standard and Analysis**</u>

The ALJ determines which of claimant's medically determinable impairments, or a combination thereof, is "severe" at step two of the sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4)(ii).  An ALJ's failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe. *Dray v. Astrue*, 353 F. App'x 147, 149 (10ᵗʰ Cir. 2009) (unpublished) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1256 (10ᵗʰ Cir. 2007)); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10ᵗʰ Cir. 2008). This is because, "in assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe.*" *Wells v. Colvin*, 727 F.3d 1061, 1065 (10ᵗʰ Cir. 2013) (emphasis in original) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)).

In *Wells v. Colvin*, the Tenth Circuit held that "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five." *Wells*, 727 F.3d at 1068-69.  At step two in *Wells*, "the ALJ stated that [the] findings [of mild limitations] do not result in further limitations in work-related functions in the RFC assessment below," and then reiterated that the mental impairments were nonsevere.  *Id.* (brackets and internal quotation marks omitted).  Concerned that this language implied that the ALJ "may have relied on his step-two findings to conclude that [the claimant] had no limitation based on her mental impairments," *Wells* held that such analysis "was inadequate under the regulations and the Commissioner's procedures."  *Id.*  "[T]o the extent the ALJ relied on his findings of non-severity as a substitute for adequate RFC analysis, the Commissioner's regulations demand a more thorough analysis."  *Id.* at 1071.  *Wells* further discussed the requirements for analysis of

mental impairments at step four, noting that the step-four RFC assessment is more detailed than the step-two severity assessment and listing various functions that may be relevant to a mental RFC assessment.  *See id.* at 1068-69.

In *Wells*, however, the ALJ, in addition to his statement about the RFC at step two, separately discussed the claimant's nonsevere mental impairments in his RFC analysis at step four.  *See id.* at 1068-69.  The Tenth Circuit stated that "[h]is discussion, though far from systematic, may have been adequate to fulfill his duty at step four to determine [the claimant's] mental RFC."  *Id.* at 1065; *see also id.* at 1068-69.  Ultimately the problem in *Wells* was that the ALJ's step four discussion related to the claimant's nonsevere mental impairments was not supported by substantial evidence.  *Alvey v. Colvin*, 536 F. Appx. 792, 794 (10th Cir. 2013) (citing *Wells*, 727 F.3d at 1065-69).

Having found other severe impairments at step two, the ALJ's failure to find Mr. Archuleta's depression severe at step two is not reversible error.  Here, at step two, the ALJ considered the medical severity of Mr. Archuleta's alleged depression and determined "it did not cause more than minimal limitation in the Claimant's ability to perform basic mental work activities and was therefore non-severe."  Tr. 18.  The ALJ considered the four broad functional areas of mental functioning, as he was required to do, and rated Mr. Archuleta's limitations in each area as mild.  Tr. 19.

Further, the ALJ did not disregard Mr. Archuleta's depression when assessing his ability to do work-related mental activities at step four.  At step four, the ALJ recounted Mr. Archuleta's hearing testimony regarding his difficulty concentrating, and that he experiences depression and irritability.  Tr. 21.  The ALJ also noted Mr. Archuleta's reported mental functional limitations regarding his ability to concentrate, understand, follow instructions, and

get along with others.  *Id.*  The ALJ determined, however, that Mr. Archuleta's statements

regarding the intensity, persistence and limiting effect of his mental health symptoms, *inter alia*,

were not entirely consistent with the medical evidence.  *Id.*  In support, the ALJ discussed

Dr. Swisher's December 16, 2019, assessment in which she determined that Mr. Archuleta's

depression was non-severe.  Tr. 28.  The ALJ found her findings persuasive and supported by the

record as a whole.[35]  *Id.*  Then, citing *objective* findings from numerous records, the ALJ found

that mental status exams consistently showed that Mr. Archuleta had "normal mood and affect,

normal behavior, normal attention, intact memory, normal thought content, good eye contact,

normal speech, intact judgment and insight, and was fully oriented."[36]  The record supports these

findings.  Moreover, the record evidence Mr. Archuleta cites to rebut the ALJ's finding is not

supportive of his position, as it either predates his alleged onset date or consists primarily of his

subjective complaints the ALJ addressed.  Doc. 17 at 24.

In sum, the Court finds that the ALJ adequately satisfied his duty at step four in

considering Mr. Archuleta's nonsevere impairment of depression, and that the ALJ's RFC

findings are supported by substantial evidence.  As such, there is no reversible error as to this

issue.

---

[35] Mr. Archuleta does not dispute the ALJ's evaluation of Dr. Swisher's opinion.

[36] The ALJ cites Ex. 9F/13: April 2, 2018, Treatment Note by PA-C Delaney (normal mental status exam) – Tr. 944; Ex. 9F/13: March 24, 2015, Treatment Note by CNS Shey (normal mental status exam) – Tr. 954-55; Ex. 9F/23: May 16, 2017, Treatment Note by PA-C Delaney (normal mental status exam) – Tr. 964; Ex. 18F/8: November 27, 2018, Treatment Note by Dr. Coomber (normal mood and affect) – Tr. 1267; Ex. 37F/3: January 24, 2020, Treatment Note by Dr. Tranchida (no depression or anxiety) – Tr. 1434; Ex. 38F: LCSW Julia Eddy Intake, *see* Section B.1.e. *supra* – Tr. 1451; Ex. 40F/15: April 22, 2019, Treatment Note by PA-C Alysha Marie Gallegos (normal mood, affect, speech, behavior, judgment and thought content) – Tr. 1474.

C.      **The ALJ Properly Considered Mr. Archuleta's Subjective Complaints**

Last, Mr. Archuleta argues that the ALJ's finding that Mr. Archuleta's impairments are

not as incapacitating as he alleged and not fully consistent with the evidence of record is contrary

to the evidence and the law.  Doc. 17 at 25-27.  Mr. Archuleta argues that, similar to the Tenth

Circuit's findings in *Hamlin v. Barnhart*,[37] the longitudinal evidence here is replete with his

attempts to find relief from his pain and mental health symptoms including trials of medications,

numerous doctor appointments, and failed attempts at various therapies.  *Id.*  Mr. Archuleta

argues that the ALJ cherrypicked through the record and omitted findings, such as

Mr. Archuleta's need to use a cane for ambulation, that support Mr. Archuleta's claim of

disability.  *Id.*

The Commissioner asserts that the ALJ appropriately assessed Mr. Archuleta's subjective

symptoms.  Doc. 23 at 15-18.  The Commissioner asserts that the ALJ outlined the objective

medical evidence, discussed Mr. Archuleta's daily activities and various courses of treatment,

and cited notations of possible symptom magnification.  *Id.*  The Commissioner asserts that the

ALJ then adequately explained why those factors undermined Mr. Archuleta's subjective

complaints.  *Id.*  The Commissioner asserts that Mr. Archuleta is once against asking the Court to

reweigh evidence the ALJ properly considered.  *Id.*

SSR 16-3p defines the two-step process an ALJ must use when evaluating a claimant's

symptoms.  *See* SSR 16-3p, 2017 WL 5180304.  At the first step, the ALJ "consider[s] whether

there is an underlying medically determinable physical or mental impairment[ ] that could

reasonably be expected to produce [the] individual's symptoms such as pain." *Id.* at *3.  At the

second step, after the ALJ has found such an impairment, the ALJ "evaluate[s] the intensity and

---

[37] 365 F.3d 1208 (10th Cir. 2004).

persistence of those symptoms to determine the extent to which the symptoms limit [the]

individual's ability to perform work-related activities...." *Id.*   The ALJ considers the record

evidence, the claimant's statements, the medical and non-medical source statements, and a non-

exhaustive list of factors provided in 20 C.F.R. § 404.1529(c)(3), which include:

1.   Daily activities;

2.   The location, duration, frequency, and intensity of pain or other symptoms;

3.   Factors that precipitate and aggravate the symptoms;

4.   The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.   Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6.   Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.   Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8.

As an initial matter, the Court finds that Mr. Archuleta's reliance on *Hamlin* is misplaced.

In that case the Tenth Circuit held that the ALJ's determination that claimant's allegations of

disabling pain were of limited credibility was not supported by substantial evidence because the

ALJ (1) improperly relied on the claimant's daily activity of watching television as requiring

"significant attention and concentration ... inconsistent with severe and intractable pain";

(2) improperly substituted his own opinion for that of the claimant's treating providers regarding

the claimant's need for an assistive device for neck pain; (3) improperly relied on minor

discrepancies in the claimant's various testimonies regarding his pain while failing to discuss

probative testimony; and (4) the record contained no evidence of exaggeration from any medical

professionals.  *Hamlin*, 365 F.3d at 1020-22.  As discussed below, these deficiencies are not present in this case.

Here, the ALJ determined that Mr. Archuleta's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that Mr. Archuleta's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  Tr. 21. Relevant to SSR 16-3p and 20 C.F.R. § 404.1529(c)(3), the ALJ explicitly discussed Mr. Archuleta's hearing testimony and reported functional limitations related to his chronic pain. Tr. 21.  The ALJ discussed Mr. Archuleta's testimony regarding his severe pain in his lower back, how getting into a squatting position often alleviates his pain, that he requires the use of a cane at all times for standing and walking, that certain of his attempted treatment therapies had provided little relief, that he has difficulty concentrating, and that he experiences depression and irritability as a result of his pain.  *Id.*

The ALJ also discussed, however, that Mr. Archuleta reported on different occasions to various providers that walking, yoga, massage therapy, pain medication, physical therapy, chiropractic care and injections were helpful, provided him with relief from his symptoms, and that he was improving.  Tr. 22-24.  The ALJ cited medical record evidence wherein Mr. Archuleta reported using his cane only intermittently and that he was walking without a cane for some time after having an injection for piriformis syndrome but included in the RFC that Mr. Archuleta requires the use of a cane to ambulate.  Tr. 24.  The ALJ discussed that the objective medical evidence, including diagnostics and physical exams, demonstrated, in large part, unremarkable findings.  Tr. 22-24.  The ALJ discussed that Mr. Archuleta's daily activities during the relevant period of time included multiple reports of him taking care of foster children

which Mr. Archuleta considered to be full-time work, and that Mr. Archuleta reported managing his personal care with minor difficulty, doing light household chores, driving a vehicle, shopping by computer, handling his finances, visiting with his family in his home, and on at least one occasion playing football. Tr. 21. 23. The ALJ also discussed that two medical professionals, including one of Mr. Archuleta's treating providers, expressed concern that Mr. Archuleta was magnifying his symptoms. Tr. 23, 24. The record supports these findings.

Thus, without reweighing the evidence, the Court finds that the ALJ's findings are supported by substantial evidence and are sufficient to undermine Mr. Archuleta's statements concerning the intensity, persistence and limiting effects of his symptoms. As such, there is no error as to this issue and the ALJ's RFC is supported by substantial evidence.

### IV.  Conclusion

For the reasons stated above, Mr. Archuleta's Motion for Remand (Doc. 17) is **DENIED** and the Administration's findings are **AFFIRMED**.

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**